UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

THOMAS LEONARD,

        Plaintiff,                        Case No: 03-72199

vs.                                     Hon. Gerald E. Rosen

STEPHEN ROBINSON,

        Defendant.

_____/

OPINION AND ORDER REGARDING
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on     May 4, 2005    

PRESENT:  Honorable Gerald E. Rosen
                 United States District Judge

## I. INTRODUCTION

Plaintiff Thomas Leonard commenced this action in this Court on June 6, 2003, asserting federal constitutional and state-law tort claims arising from his arrest and detention by Defendant Stephen Robinson, a Montrose Township police officer, following a heated exchange between Plaintiff and the Montrose Township supervisor during a public meeting of the Township Board of Trustees.  Plaintiff contends that he was arrested without probable cause, in violation of the Fourth Amendment protection against unreasonable seizures, and that Defendant committed the state-law torts of false arrest, false imprisonment, and battery.

By motion filed on November 20, 2003, Defendant now seeks summary judgment in his favor on Plaintiff's federal and state-law claims.  In support of this motion, Defendant contends that he had probable cause to arrest Plaintiff for using "profane" language in public and for disorderly conduct.  Alternatively, Defendant argues that he is entitled to qualified immunity, where a reasonable officer in his position would not have known that Plaintiff's arrest was illegal.  In a response filed on December 15, 2003, Plaintiff contends that there is an issue of fact as to whether he was arrested for the reasons cited by Defendant, or whether his arrest actually was motivated by his exercise of his First Amendment right of free speech.  On January 5, 2004, Defendant filed a reply in further support of his motion.[1]

Having reviewed these submissions and the record as a whole, the Court finds that the relevant facts and legal arguments have been ably presented in these written materials, and that oral argument would not significantly aid the decisional process.  Accordingly, the Court will decide Defendant's motion "on the briefs."  See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of Michigan.  This Opinion and Order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

The relevant facts of this case are straightforward and largely undisputed.  Indeed,

_____

[1]This reply has spawned further submissions, through which Defendant seeks leave of the Court to file an overlength brief and Plaintiff requests that this reply be stricken as too long and untimely filed.  Upon considering this matter, the Court elects to accept Defendant's reply brief, as it does not inappropriately seek to raise any new issues, but instead is confined largely to a discussion of the principal authorities cited in Plaintiff's response.

the key events in this case were captured on a videotape of the October 15, 2002 meeting of the Montrose Township Board of Trustees.  While the tape is of somewhat poor quality and some events occur off camera, it confirms the parties' largely shared view of what transpired at this meeting.

On the evening of October 15, 2002, the Montrose Township Board of Trustees held a scheduled public meeting at the Township hall.  Plaintiff Thomas Leonard was in attendance, as was his wife, Sarah Leonard.  Defendant Stephen Robinson, a Montrose Township police officer, arrived at the meeting at some point after it had begun.  Defendant testified at his deposition that he had been ordered by the chief of police to stop by the meeting for a few minutes during his shift that evening.[2]

At some point after Defendant arrived at the meeting, a Township citizen questioned why he was there.  In response, Defendant stated that another police officer was patrolling the streets, and that he was present "because it's a township meeting, . . . [and] I'd like to see what's going on at the township meeting."  (Defendant's Motion, Ex. 4, 10/15/2002 Meeting Tr. at 2.)  Defendant did not indicate that he had been ordered to attend the meeting, but neither did he represent that he was off duty at the time.

Both Plaintiff and his wife addressed the board that evening.  First, Sarah Leonard spoke at some length about the Township's purported failure to give its business to her

---

[2]There apparently were several events going on in the area that night, including a basketball game and a City of Montrose board meeting, and Defendant was instructed to attend a portion of each of these events.

3

auto repair and towing company.[3]  Next, after being given permission to speak, Plaintiff

stood up to vehemently complain that the board members and the Township attorneys had

been "screwing over" his family's business.  In response, Township Supervisor Don

Papineau stated his disagreement that the Township had "screwed over" this business.

This denial prompted Plaintiff to exclaim in a loud voice, "That's why you['re in a]

goddamn lawsuit."  (Defendant's Motion, Ex. 4, 10/15/2002 Meeting Tr. at 3.)

    As Plaintiff sat down following this remark, the Township supervisor admonished

him not to "use the Lord's name in vain."  (Id. at 4.)  Plaintiff responded that "I'll do

whatever I want, Don, just like you."  (Id.)  At about the same time, Defendant

approached Plaintiff and told him to calm down.  Plaintiff told Defendant to "stay out of

it," and that "I'm not talking to you."  (Id.)  More generally, Plaintiff questioned the basis

for Defendant's presence at the meeting, prompting Defendant to respond that "I c[a]me

here as a police officer."  (Id.)  As Plaintiff and Defendant continued their verbal dispute,

Defendant apparently again advised Plaintiff to calm down or "I'm going to take you with

me," and Plaintiff reportedly responded, "I'm ready to go, so . . . [l]et's go."  (Id.)[4]

_____

[3]According to Plaintiff, Sarah Leonard has filed a number of lawsuits against the
Township, including a suit against the Township and its chief of police alleging that they took
business away from her company in retaliation against her exercise of her First Amendment right
of free speech.  Defendant stated at his deposition that he "heard through the grapevine" about
this dispute between Sarah Leonard and the police chief, but that he had not spoken to any
Township board members about the Leonards at any time prior to the October 15, 2002 meeting,
and that he had not reviewed in advance the agenda of this meeting.  (See Plaintiff's Response,
Ex. 4, Robinson Dep. at 17.)

[4]Much of this activity took place off camera, and the audio portion of the videotapes
provided by the parties is difficult to understand at this point.  Nonetheless, the parties agree on
the relevant aspects of this incident.

According to Plaintiff's deposition testimony, he voluntarily agreed to leave the meeting room along with Defendant, but objected when Defendant attempted to escort him by the arm.  When Plaintiff asked Defendant not to "put his hands on me" because "[y]ou've asked me to leave, and I'm leaving with you," Defendant reportedly responded that "you're in my care and custody" and "I'm now placing you under arrest."  (Plaintiff's Response, Ex. 6, Thomas Leonard Dep. at 59-60.)  After the two men exited the meeting room and entered an adjacent hallway, Defendant placed Plaintiff in handcuffs.  Plaintiff "started screaming he's putting me in cuffs now [and] he's placing me under arrest," leading Plaintiff's wife to follow him into the hallway and question why he was being arrested.  (Id. at 60.)  Defendant stated in his arrest report that Sarah Leonard "grabbed my arm in [an] attempt to free Mr. Leonard from my custody," (Plaintiff's Response, Ex. 7, Arrest Report), but Plaintiff testified that Defendant first grabbed ahold of his wife, and that she broke free of the officer's grip and ran away, (see Plaintiff's Response, Ex. 6, Thomas Leonard Dep. at 60).

Plaintiff was transported to the Township police station and placed in a holding cell.  He was detained for 60 to 90 minutes, and was issued a citation charging him with two misdemeanor offenses.  (See Plaintiff's Response, Ex. 8, 10/15/2002 Citation.)  Specifically, Plaintiff was charged with disorderly conduct in violation of  Mich. Comp. Laws § 750.167, and with using obscene language in violation of Mich. Comp. Laws § 750.337.  These charges subsequently were dismissed, and this lawsuit followed.

# III.  ANALYSIS

**A.      The Standards Governing Defendant's Motion**

Through his present motion, Defendant seeks summary judgment in his favor pursuant to Fed. R. Civ. P. 56.  Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Three 1986 Supreme Court cases — Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), and Celotex Corp. v. Catrett, 477 U.S. 317 (1986) — ushered in a "new era" in the federal courts' review of motions for summary judgment.  These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[5]  Celotex explains:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

Celotex, 477 U.S. at 322.

Upon reviewing this trilogy of decisions, the Sixth Circuit adopted a series of principles governing motions for summary judgment.  These principles include:

> * Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

---

[5]"Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A C. Wright, A. Miller, M. Kane, Federal Practice & Procedure, § 2727, at 33 (1993 Supp.).

6

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.  This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence.  The respondent  must "do more than simply show that there is some metaphysical doubt as to the material facts."  Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted.  The trial court has at least some discretion to determine whether the respondent's claim is plausible.

Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989); see also Nernberg

v. Pearce, 35 F.3d 247, 249 (6th Cir. 1994).  The Court will apply these principles in

resolving Defendant's motion.

**B.     Defendant's Arrest of Plaintiff Was Supported by Probable Cause.**

The sole federal claim asserted in Plaintiff's complaint is that Defendant violated

his rights under the Fourth and Fourteenth Amendments by arresting him without

probable cause.  In support of his present motion, Defendant argues that Plaintiff's arrest

was justified by probable cause to believe that he had violated at least one provision, and

perhaps two, of Michigan's penal code.  The Court agrees.

Under core Fourth Amendment principles, of course, the government's seizure of a

person must be "reasonable," U.S. Const. amend. IV, and a seizure that rises to the level

7

of an arrest must be supported by probable cause.  See Kaupp v. Texas, 123 S. Ct. 1843,

1846 (2003); Michigan v. DeFillippo, 443 U.S. 31, 36-37, 99 S. Ct. 2627, 2631-32

(1979).  The Supreme Court "repeatedly has explained that 'probable cause' to justify an

arrest means facts and circumstances within the officer's knowledge that are sufficient to

warrant a prudent person, or one of reasonable caution, in believing, in the circumstances

shown, that the suspect has committed, is committing, or is about to commit an offense."

DeFillippo, 443 U.S. at 37, 99 S. Ct. at 2632.  Moreover, "[w]hether an officer is

authorized to make an arrest ordinarily depends, in the first instance, on state law."

DeFillippo, 443 U.S. at 36, 99 S. Ct. at 2631.

        Here, Defendant acknowledges that he placed Plaintiff under arrest, at least at the

point that he led Plaintiff out of the township hall and put him in handcuffs.  After his 60

to 90 minute detention, Plaintiff was released and issued a citation charging him with two

misdemeanor offenses.  First, Plaintiff was charged with being a "disorderly person" in

violation of Mich. Comp. Laws § 750.167.  Next, Plaintiff was charged with violating

Mich. Comp. Laws § 750.337, which prohibits the use of "any indecent, immoral,

obscene, vulgar or insulting language in the presence or hearing of any woman or child."

As Defendant points out, he is authorized under Michigan law to arrest a person who

commits a misdemeanor in his presence, see Mich. Comp. Laws § 764.15(1)(a), and there

is no dispute that the conduct that gave rise to Plaintiff's arrest occurred while Defendant

was present at the township board meeting.

        Defendant now acknowledges, however, that he could not lawfully have arrested

8

Plaintiff for at least one, and perhaps either, of the two offenses listed on the citation issued to Plaintiff.  First, with regard to Plaintiff's alleged violation of Mich. Comp. Laws § 750.337, the Michigan Court of Appeals has held that this statute is unconstitutionally vague, in light of the absence of any "restrictive language whatsoever in the statute that would limit or guide a prosecution for indecent, immoral, obscene, vulgar, or insulting language."  People v. Boomer, 250 Mich. App. 534, 655 N.W.2d 255, 258-59 (2002).[6] This case was decided on March 29, 2002, and the decision was released for publication on July 11, 2002, several months before Plaintiff's arrest in October of 2002.  Next, regarding the charge under Mich. Comp. Laws § 750.167, Plaintiff asserts that the various statutory definitions of a "disorderly person" do not reach his conduct in this case,[7] and Defendant does not contend otherwise in his motion.

Nonetheless, Defendant argues that Plaintiff's conduct at the township board meeting gave rise to probable cause to arrest him for two **_other_** state-law misdemeanor offenses, although neither of these was charged in the citation actually issued to Plaintiff at the time.  First, Defendant points to the Michigan prohibition against "profanely

---

[6]As noted by Defendant, the Michigan court issued this ruling in the so-called "cussing canoeist" case that received a significant amount of media coverage.  The defendant in Boomer was charged and convicted under § 750.337 for "loudly utter[ing] a stream of profanities" after he fell out of a canoe while traveling down the Rifle River.  Boomer, 655 N.W.2d at 256.

[7]The only subsection of § 750.167 that might arguably apply, and the one cited in Defendant's deposition testimony, is the provision defining a "disorderly person" as "[a] person who is engaged in indecent or obscene conduct in a public place."  Mich. Comp. Laws § 750.167(1)(f).  As noted by Plaintiff, however, this provision seemingly is directed at indecent conduct of a more sexual nature, such as indecent exposure in a public place.  See, e.g., People v. De Vine, 271 Mich. 635, 261 N.W. 101, 102 (1935); United States v. Whitmore, 314 F. Supp.2d 690, 698-99 (E.D. Mich. 2004).

9

curs[ing] or damn[ing] or swear[ing] by the name of God, Jesus Christ or the Holy Ghost." Mich. Comp. Laws § 750.103. The parties have not cited, nor has the Court's own research uncovered, any Michigan court decision construing this statute. Yet, the plain language of this enactment seemingly would reach Plaintiff's reference to a "goddamn lawsuit" during his remarks at the October 15, 2002 township board meeting.

Plaintiff does not contend otherwise in his response to Defendant's motion. Rather, he points to the purely after-the-fact nature of the justification now being offered by Defendant as grounds for a lawful arrest. Where, as here, an officer seeks to rely on an offense different from the one that the officer actually had in mind at the time of the challenged arrest, some courts have held that the two offenses must be sufficiently "related" to permit such an after-the-fact justification. See, e.g., Avery v. King, 110 F.3d 12, 14-15 (6th Cir. 1997); Sheehy v. Town of Plymouth, 191 F.3d 15, 19-20 (1st Cir. 1999); Trejo v. Perez, 693 F.2d 482, 485-86 (5th Cir. 1982). Plaintiff maintains that this requirement of "relatedness" cannot be satisfied in this case, because the offense actually cited by Defendant at the time of arrest, a violation of Mich. Comp. Laws § 750.337, was not a crime at all in light of the Michigan court's earlier invalidation of this statute in Boomer. It follows, in Plaintiff's view, that this Court is foreclosed from considering § 750.337 as it conducts the "relatedness" inquiry employed in Avery and the other above-cited cases, leaving nothing with which to compare the statute now relied upon by Defendant, Mich. Comp. Laws § 750.103.

The Court need not decide whether Plaintiff has advanced a tenable reading of the

10

"relatedness" requirement, because no such requirement exists in the wake of the Supreme Court's recent decision in <u>Devenpeck v. Alford</u>, 125 S. Ct. 588 (2004). As the Court explained in that case, the Fourth Amendment probable cause inquiry is governed by a purely objective standard, and depends solely "upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." <u>Devenpeck</u>, 125 S. Ct. at 593. Thus, "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause," and the officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause." 125 S. Ct. at 593-94. Rather, "[t]hose are lawfully arrested whom the facts known to the arresting officers give probable cause to arrest." 125 S. Ct. at 594. The Court reasoned that the rule of "relatedness" as applied in <u>Sheehy</u>, <u>Trejo</u>, and other cases was "inconsistent with" this objective probable cause standard, and also was "condemned by its perverse consequences," as it would encourage officers to either "cease providing reasons for arrest" or "simply give every reason for which probable cause could conceivably exist." 125 S. Ct. at 594-95.

In light of this Supreme Court ruling, Plaintiff's Fourth Amendment claim in this case is defeated so long as Defendant can identify ***any*** legal basis for Plaintiff's arrest under the facts known to Defendant at the time. The offenses cited in support of Defendant's motion need not be related in any way to the offenses listed in the citation issued to Plaintiff on the date of his arrest. Nor does it matter whether the Michigan statute now relied upon by Defendant, Mich. Comp. Laws § 750.103, might be vulnerable

11

to some sort of legal challenge, or whether it might some day be held unconstitutional in some respect.[8]  Rather, "[p]olice are charged to enforce laws until and unless they are declared unconstitutional," and "[t]he enactment of a law forecloses speculation by enforcement officers concerning its constitutionality."  DeFillippo, 443 U.S. at 38, 99 S. Ct. at 2632.

Thus, all that matters here is that a reasonable officer armed with the facts available to Defendant at the time would have believed that Plaintiff had violated § 750.103.  As discussed, Plaintiff does not challenge this proposition, nor does the Court's own review call this objective probable cause determination into question.  This lawful justification, though not cited by Defendant at the time, suffices to defeat Plaintiff's Fourth Amendment claim of arrest without probable cause.

In addition, though the question is perhaps a bit closer, the Court is inclined to agree with Defendant's assertion that he had probable cause to arrest Plaintiff for violating Mich. Comp. Laws § 750.170.  In contrast to the more general "disorderly person" statute cited by Defendant at the time of Plaintiff's arrest, § 750.170 prohibits the "mak[ing] or excit[ing] [of] any disturbance or contention" in various sorts of business establishments "or at any election or other public meeting where citizens are peaceably and lawfully assembled."  Mich. Comp. Laws § 750.170.[9]  Arguably, once Plaintiff was

---

[8]Notably, Plaintiff has not suggested that § 750.103 is constitutionally deficient or suspect in any way, nor has any Michigan court so held.

[9]Defendant also cites a Montrose Township ordinance prohibiting various breaches of the peace, including "interfer[ence] with other orderly conduct of any place of business."

cautioned by the township supervisor not to "use the Lord's name in vain"and he was
approached by Defendant and asked to calm down, he perhaps could be viewed as
creating a disturbance at the ongoing township board meeting by continuing to talk back
to the township supervisor, challenging the legitimacy of Defendant's presence at the
meeting, and generally refusing to calm down.

Apart from arguing that § 750.170 and the statute cited by Defendant at the time, §
750.167, do not set forth "related" offenses, Plaintiff also contends that his conduct did
not violate the former statute because no township board member ever directed his
removal from the meeting, and because the board was able to continue its meeting "after a
short recess." (Plaintiff's Response at 18.)  These circumstances, in Plaintiff's view,
serve to distinguish this case from two Michigan Court of Appeals decisions affirming
convictions under § 750.170 for causing disturbances in a business establishment or
public building.  See People v. Mash, 45 Mich. App. 459, 206 N.W.2d 767 (1973);
People v. Weinberg, 6 Mich. App. 345, 149 N.W.2d 248 (1967).  In Mash, the defendant
had participated in an after-hours sit-in at a university building, while the defendants in
Weinberg sat down on the floor in front of teller's windows at a bank to protest the
bank's allegedly discriminatory employment and loan practices.  Plaintiff argues that the
record here lacks any comparable evidence of disruptive conduct.

Contrary to Plaintiff's contention, however, the Court does not read the decisions

---

(Plaintiff's Response, Ex. 10, Montrose Township Ordinance No. 1990-1, § 2.2.)  The parties
agree that the conduct reached by this ordinance and by § 750.170 is largely the same.

13

in Mash and Weinberg as defining the entire and exclusive universe of circumstances under which a person might be deemed to have violated § 750.170.  Rather, the statute prohibits the making of any sort of disturbance at a business establishment or public meeting, without regard for such considerations as the length or extent of this disturbance, and without regard for whether one of the meeting's participants affirmatively recognized the creation of a disturbance or asked that the alleged perpetrator be removed.  In light of the plain language of § 750.170, and in the absence of any Michigan court decisions that might counsel against a straightforward reading of this statute, the Court finds that there was probable cause to believe that Plaintiff's conduct at the October 15, 2002 township board meeting ran afoul of the Michigan statutory prohibition against making a disturbance at a public meeting.  It follows that Defendant was lawfully entitled to arrest Plaintiff for this offense, regardless of whether Defendant subjectively recognized this at the time.

**C.    Defendant Is Entitled to Qualified Immunity on Plaintiff's Claim of Retaliatory Arrest.**

As noted earlier, the only federal constitutional violation alleged in Plaintiff's complaint is a Fourth Amendment claim of arrest without probable cause.  In his response to Defendant's motion, however, Plaintiff advances a somewhat different constitutional theory — namely, that Defendant unlawfully arrested him for engaging in protected First Amendment activity.[10]  Regardless of whether he otherwise could have been lawfully

_____

[10]In support of his request for leave to file an overlength reply brief, Defendant contends that Plaintiff has advanced an entirely "new" legal theory that was not pled in his complaint and

14

arrested, Plaintiff argues that this protected activity introduces issues of fact as to whether Defendant's decision to arrest Plaintiff was grounded in legitimate considerations of probable cause, or whether it instead was based upon an unlawful desire to retaliate against Plaintiff's exercise of his First Amendment right of free speech.

In challenging the viability of this claim of retaliation, Defendant argues both that the record does not support such a claim, and that the doctrine of qualified immunity shields him from any possible liability for this alleged violation. Both of these issues are encompassed within the Court's two-pronged qualified immunity inquiry. First, Court must consider "whether, based upon the applicable law, the facts viewed in the light most favorable to [Plaintiff] show that a constitutional violation has occurred." Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002). If so, the Court "must then consider whether the violation involves clearly established constitutional rights of which a reasonable person would have known." Burchett, 310 F.3d at 942 (internal quotation marks and

---

that Defendant could not have anticipated in his initial brief in support of his motion. Plaintiff responds, however, that this purportedly "new" theory is merely a modest variation on the Fourth Amendment claim that he has pursued all along in this litigation. In particular, Plaintiff reads the relevant case law as holding that an arrest violates the Fourth Amendment if based upon conduct that is constitutionally protected — in this case, free speech protected by the First Amendment.

Upon reviewing the pertinent decisions, it seems evident to the Court that Plaintiff's theory of recovery arises under the First rather than the Fourth Amendment. See, e.g., McCurdy v. Montgomery County, 240 F.3d 512, 519-20 (6th Cir. 2001) (addressing a "First Amendment retaliation claim" that is analogous to the claim advanced by Plaintiff here). Yet, it is not necessary to decide precisely how this claim should be characterized, where the parties are in agreement as to the Sixth Circuit precedents that govern the resolution of this claim, and where Defendant does not contend that Plaintiff should be barred from pursuing a claim that arguably was not asserted in his complaint.

15

citations omitted).

The parties agree that the qualified immunity analysis in this case is guided in substantial part by the Sixth Circuit's decisions in <u>McCurdy</u>, <u>supra</u>, and in <u>Greene v. Barber</u>, 310 F.3d 889 (6th Cir. 2002).  In the first of these cases, plaintiff James McCurdy and three other men were standing outside McCurdy's apartment building at around 5:00 a.m. when defendant police officer David Cole drove past on routine patrol.  After his initial drive-by, Officer Cole circled back around toward the men, stopped to gain their attention, and then asked, "What's up gentlemen?"  <u>McCurdy</u>, 240 F.3d at 515.  McCurdy initially responded by asking either "What's the problem?" or "Can I help you?"  240 F.3d at 515.  When Officer Cole indicated that he had not heard McCurdy and asked him to repeat what he had said, McCurdy responded by demanding, "What the f**k do you want?"  240 F.3d at 515.

At this point, Officer Cole exited his squad car, approached McCurdy, and questioned him about his use of profane language.  When McCurdy again inquired as to the reason for the officer's approach, Officer Cole responded that "it was his job to 'see what's going on' if 'somebody's standing out here at 5:00 in the morning.'" 240 F.3d at 515.  McCurdy responded with another obscenity, and Officer Cole, in turn, requested that McCurdy and the other men produce identification.  McCurdy refused this request, as well as the officer's demand that he return to his apartment,[11] and instead insisted (in

---

[11]Officer Cole testified that he ordered McCurdy to return to his apartment because he lacked identification and because, by his own admission, he had been drinking and appeared, in Officer Cole's view, to be "obviously intoxicated."  <u>McCurdy</u>, 240 F.3d at 516.

16

language featuring still more profanity) that he could not be compelled to heed the officer's instructions.  Officer Cole then warned that McCurdy would be arrested if he did not return to his home, but McCurdy again refused, questioning the basis upon which the officer could arrest him.  At this point, Officer Cole took McCurdy into custody and took him to the precinct station, where he was charged with disorderly conduct/public intoxication and obstructing official business.

McCurdy subsequently brought suit against Officer Cole and his municipal employer, challenging his arrest on both Fourth and First Amendment grounds. Regarding the former, the Sixth Circuit set aside a jury verdict in Officer Cole's favor, finding that the officer lacked probable cause to arrest McCurdy for disorderly conduct.[12] Turning next to McCurdy's First Amendment retaliation claim, the Sixth Circuit reversed the district court's grant of qualified immunity to Officer Cole, and remanded for further consideration "whether McCurdy's arrest was at least partially motivated by protected conduct."  240 F.3d at 520.  In so ruling, the Court explained:

> . . . .  We have held that adverse state action motivated at least in part as a response to the exercise of the plaintiff's constitutional rights presents an actionable claim of retaliation.  Since the day the ink dried on the Bill of Rights, the right of an American citizen to criticize public officials and policies . . . is the central meaning of the First Amendment.  There can be no doubt that the freedom to express disagreement with state action, without fear of reprisal based on the expression, is unequivocally among the protections provided by the First Amendment.

---

[12]The Court's analysis on this point rested solely upon the disorderly conduct charge, with no discussion as to whether McCurdy's arrest might have been justified on some other ground — such as, for example, the charge of obstructing official business that was lodged against McCurdy on the night of his arrest.

17

It is well-established then that McCurdy had a constitutional right to challenge verbally Officer Cole's surveillance, and we therefore reverse the district court's grant of qualified immunity to Officer Cole.

McCurdy, 240 F.3d at 520 (internal quotation marks and citations omitted).

More recently, the panel in Greene addressed a similar use of profanity during a private citizen's encounter with a police officer. In that case, plaintiff Anthony Greene, an attorney, went to the Grand Rapids Police Department to retrieve his car after it had been towed. He first encountered an intern, and complained in an "animated expressive voice" about the excessive fees being charged for the return of his vehicle. Greene, 310 F.3d at 892. The intern directed Greene to his supervisor, defendant police lieutenant Jack Barber. When the lieutenant adopted what Greene viewed as a tone of "arrogance" in the ensuing conversation, Greene responded in a loud voice that "you're really being an a**hole." 310 F.3d at 892.

Lt. Barber insisted that he could not be spoken to in this way "in my building," but Greene responded that "I'm exercising my freedom of speech," and that "if you don't like it you should move to another country." 310 F.3d at 892. After Lt. Barber again demanded that Greene not address him in this way "in my building," Greene told him, "Well, if that's how you feel you're really stupid." 310 F.3d at 892-93. At that point, Lt. Barber advised Greene that he was under arrest, and the lieutenant and two other officers together were eventually able to restrain him, in part through the use of pepper spray. Greene subsequently was charged with creating a disturbance and hindering and opposing a police officer, but a state court jury acquitted him of both charges.

18

Greene then brought suit in federal court, asserting claims of First Amendment retaliation and excessive force.  Regarding the former, the Sixth Circuit first observed that "a respectable argument can be made" that Lt. Barber had probable cause to arrest Greene for creating a disturbance.  310 F.3d at 895.  Nonetheless, the Court explained that "the existence of probable cause is not determinative of the constitutional question if, as alleged here, the plaintiff was arrested in retaliation for his having engaged in constitutionally protected speech."  310 F.3d at 895.  The Court next stated:

> Did Mr. Greene have a constitutionally protected right to call Lt. Barber an "a**hole" and castigate him as "stupid?"  The answer, we suggest, depends on the time, place, and manner in which Mr. Greene so expressed himself.  It is clear that the Constitution gave Mr. Greene no license to interrupt the transaction of public business by loud animadversions on Lt. Barber's personality and mental capacity, or any other subject, for that matter — consider, for example, the likely consequence of someone's interrupting an oral argument in a Sixth Circuit courtroom with a diatribe like Mr. Greene's — but, standing alone, the fact that Mr. Greene's remarks were unflattering to Lt. Barber clearly gave Barber no license to abridge Greene's freedom to speak as he did.  Government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity.

> There was a time, to be sure, when the use of a coarse epithet such as that employed by Mr. Greene would have been thought to lie outside the protection of the First Amendment.  See *Chaplinsky v. New Hampshire,* 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942) . . . .

> In recent years, however, *Chaplinsky's* "fighting words" doctrine has become "very limited."  *Sandul v. Larion,* 119 F.3d 1250, 1255 (6th Cir. 1997).  Standards of decorum have changed dramatically since 1942, moreover, and indelicacy no longer places speech beyond the protection of the First Amendment.  The words and gestures at issue in *Sandul,* for example, were even more vulgar than Mr. Greene's, but they were nonetheless held to be "speech protected by the First Amendment,"

19

circumstances present in *Sandul* having made it unlikely that the "speech"
there at issue would incite a breach of the peace. *Sandul,* 119 F.3d at 1255.
In the case at bar, by the same token, it is hard to imagine Mr. Greene's
words inciting a breach of the peace by a police officer whose sworn duty it
was to uphold the law.

Greene, 310 F.3d at 895-96 (internal quotation marks, citations, and footnote omitted).

Accordingly, the Court held that "[t]aken in the light most favorable to Mr. Greene, we

believe that the record before us would entitle a jury to find that the arrest was the product

of an improper motive." 310 F.3d at 897.

The Sixth Circuit then turned to the second prong of the qualified immunity

analysis. Citing the decision in McCurdy, which arose out of an incident that occurred

just a few months before Greene's arrest, the Court found itself "constrained to hold that

Lt. Barber should have known that an arrest undertaken at least in part as retaliation for a

constitutionally protected insult to the officer's dignity would be impermissible unless it

could be shown that the officer would have made the arrest even in the absence of any

retaliatory motive." 310 F.3d at 897. Accordingly, the Court remanded the case for

further proceedings aimed at resolving this latter question of fact.[13]

Returning to the present case, Plaintiff contends (not surprisingly) that the facts

here are "very similar" to those addressed in McCurdy and Greene, (Plaintiff's Response

at 10, 13), while Defendant maintains (equally unsurprisingly) that these Sixth Circuit

---

[13]Although Greene also had asserted First Amendment retaliation claims against the two
other officers who assisted Lt. Barber in subduing and arresting him, the Sixth Circuit agreed
with the district court that these officers were entitled to qualified immunity, where they "were
not present for the events leading up to the arrest," but instead merely "assist[ed] a fellow
officer" in dealing with an individual who evidently was "resisting arrest." 310 F.3d at 898.

rulings are distinguishable.  In one important respect, at least, the Court finds that Defendant has the better of this argument.  In both McCurdy and Greene, the plaintiff's arrests were inextricably intertwined with their encounters with the defendant police officers.  At the time that the officers in those cases approached the plaintiffs and initiated the encounters, there was as yet no basis upon which the plaintiffs could have been arrested.  Rather, any such grounds for arrest arose exclusively during the course of the interactions between the plaintiffs and the defendant officers.  Under these circumstances, the Sixth Circuit panels found questions of fact as to whether the plaintiffs' arrests were motivated in part by the protected activities in which the plaintiffs were engaged — namely, their verbal (and occasionally profane) expressions of disagreement — in the course of their encounters with the defendant officers.

Here, in contrast, at least one (and arguably both) of the grounds for a lawful arrest already existed at the time when Defendant first approached Plaintiff.  At that point, Plaintiff already had commenced his vehement complaints that the township board had been "screwing over" his family's business, and he already had made the reference to a "goddamn lawsuit" which, as discussed earlier, provided probable cause to arrest for violating Mich. Comp. Laws § 750.103.  Moreover, all of these statements were directed at the township supervisor, and not at Defendant.  Consequently, when Defendant initially approached Plaintiff and asked him to calm down, there would have been absolutely no reason to suspect that Defendant's "true motivation was to punish a slight to his dignity." Greene, 310 F.3d at 897.  Rather, Defendant presumably could only have been acting out

21

of an appropriate desire to preserve calm and order at a public meeting, or perhaps with the intention to act upon Plaintiff's apparent violation of a Michigan statute. At a minimum, there is absolutely no evidence of any improper motive or purpose that might have led Defendant to initiate the encounter with Plaintiff.

In sharp contrast to the facts presented in McCurdy and Greene, therefore, Plaintiff here did not direct any protected expression toward Defendant until ***after*** the occurrence of events that justified Defendant's initial intervention.[14] Accordingly, Plaintiff is left to contend that his exercise of his First Amendment rights motivated Defendant to ***continue*** an encounter that he had already initiated beforehand, and that was motivated at the outset — at least so far as the record reveals Defendant's initial motivations — by wholly legitimate law enforcement objectives. Whatever might be said about the exact reach of the rulings in McCurdy and Greene, it is at least clear that the panels in those cases did not confront the sort of situation presented here, where Plaintiff seeks to question the motivation for a police officer's ***continuation*** of an initially lawful encounter, and to

---

[14]Plaintiff, of course, was engaged in protected free speech before his encounter with Defendant, as he surely enjoyed a First Amendment privilege to express his views and air his complaints during the course of a public township board meeting. Yet, nothing in the record suggests that Defendant initially approached Plaintiff out of a desire to punish him for criticizing the township's allegedly unfair refusal to deal with his wife's towing business. More generally, there is no evidence whatsoever to suggest that Defendant might have acted in collusion with members of the township board to silence critics of the township's activities or policies — and, of course, no board members have been named as defendants in this litigation. While Plaintiff notes that Defendant evidently was aware of the ongoing dispute and pending litigation between Plaintiff's wife and certain township officials, including the police chief, the record is utterly silent as to any impressions Defendant might have formed as a result of this knowledge. For all that appears in the record, Defendant might have shared Plaintiff's view that he and his wife were the victims of mistreatment by township officials.

challenge an officer's authority to go forward with the arrest of an individual who is presently engaged in the protected activity of criticizing the officer.

In this Court's view, McCurdy and Greene are properly understood as recognizing a permissible inference of retaliatory motive in only a particular category of cases: namely, those cases where all of the possible grounds for arrest arise solely during the course of a citizen's encounter with a police officer, and where these grounds are inextricably intertwined with the encounter itself. In such cases, the immediate temporal proximity between protected activity and arrest, combined with the absence of any pre-existing or independent grounds for arrest, arguably would permit a reasonable conclusion that the officer acted with an improper motive. Under these circumstances, it is perhaps not unreasonable to place upon the defendant officer the burden to show that he would have made the arrest even in the absence of any protected activity. See Greene, 310 F.3d at 897.[15]

_____

[15]Even so construed, the rulings in McCurdy and Greene strike this Court as somewhat problematic. As observed by the dissent in McCurdy:

> [I]t is . . . disturbing that a drunk using offensive and foul language in the course of a _Terry_ stop, could for that reason alone under the pretense of First Amendment protected speech, intimidate and goad a police officer into believing that he dare not do what he conceives to be his duty lest somehow he violate that drunk's constitutional rights . . . . Certainly an individual should not be arrested because of constitutionally protected offensive language. But the same individual ought not to be able, by using offensive language, to prevent a police officer from assessing his conduct, and reaching a decision to arrest him, simply because the offensive language makes the police officer more certain of the correctness of his decision.

McCurdy, 240 F.3d at 526-27 (Engel, J., dissenting). Similarly, the courts of at least five other circuits have expressed their reluctance to second-guess the motives of a police officer who is

23

To permit such an inference under the record here, in contrast, would convert the First Amendment shield into an unduly powerful sword, allowing a plaintiff to raise an issue of fact about an officer's motives for an otherwise lawful arrest whenever the plaintiff speaks up during the course of the arrest. As <u>Greene</u> itself expressly acknowledges, the rule of that case does not extend so far:

> The mere fact that Mr. Greene may have been engaged in constitutionally protected speech at the time of his arrest would not suffice to negate qualified immunity, of course. See *Redd v. City of Enterprise,* 140 F.3d 1378, 1384 (11th Cir. 1998) ("when an officer has *arguable* probable cause to believe that a person is committing a particular public offense, he is entitled to qualified immunity from suit, even if the offender may be speaking at the time he is arrested").

<u>Greene</u>, 310 F.3d at 898 n.2. Indeed, as observed in <u>Greene</u>, police officers are trained to be thick-skinned in their interactions with the public, and are "expected to exercise greater restraint . . . than the average citizen" in dealing with abusive language. <u>Greene</u>, 310 F.3d at 896 (internal quotation marks and citations omitted). By the same token, the public surely has a right to hope and expect that a police officer will not abandon an otherwise lawful arrest or course of action merely because he is being criticized or taunted by the subject of his efforts.

Notwithstanding <u>McCurdy</u> and <u>Greene</u>, then, it is not enough for Plaintiff to show

---

engaged in an otherwise lawful stop or arrest, and have required that a plaintiff establish the absence of probable cause as one of the elements of a claim of retaliatory arrest or prosecution. <u>See</u> <u>Izen v. Catalina</u>, 398 F.3d 363, 367-68 & n.7 (5th Cir. 2005) (collecting cases from the Second, Third, Eighth, and Eleventh Circuits that share the Fifth Circuit's view on this issue). Under this standard, of course, Plaintiff's First Amendment retaliation claim could not be sustained, in light of the existence of probable cause to arrest him.

24

merely that he questioned Defendant's authority or otherwise engaged in protected First Amendment speech during the course of his arrest, and that Defendant nonetheless went through with this arrest. Rather, he must produce evidence from which a trier of fact could reasonably infer that Defendant actually acted with an improper motive, as opposed to the entirely lawful objectives of investigating an apparent incident of criminal conduct and arresting an individual who he reasonably believed had committed one or more misdemeanors in his presence. This inquiry is governed by familiar evidentiary standards, under which Plaintiff must produce either direct or circumstantial evidence that his protected activity was a "substantial" or "motivating" factor behind Defendant's decision to arrest him. See, e.g., Kreuzer v. Brown, 128 F.3d 359, 363 (6th Cir. 1997).

The record here contains neither form of evidence of the requisite causal connection between Plaintiff's protected speech and his arrest. First, Plaintiff has not pointed to any direct evidence bearing upon Defendant's motives for his actions, and Defendant's own statements at the time — e.g., his request that Plaintiff "calm down" — indicate that he was pursuing wholly legitimate law enforcement objectives. Neither has Plaintiff produced any circumstantial evidence of an improper motive — there is no indication in the record, for example, that others have engaged in the same or similar conduct at a township board meeting and yet not been arrested. Rather, Plaintiff's claim of retaliation rests solely upon the fact that, during the course of his encounter with Defendant, he questioned the officer's authority, told him to "stay out of it," and generally resisted the officer's entreaties to calm down or face removal from the meeting.

25

As explained above, this arguably protected activity, occurring only ***after*** Plaintiff had engaged in conduct giving rise to probable cause for an arrest, does not trigger the inference of retaliatory motive that was recognized in <u>McCurdy</u> and <u>Greene</u>.  It follows that Plaintiff cannot sustain a First Amendment claim of retaliatory arrest.

Alternatively, even if Plaintiff could establish such a First Amendment violation, the Court finds that Defendant would prevail on the second prong of the qualified immunity analysis.  In arguing that Defendant violated a "clearly established" constitutional right, Plaintiff relies exclusively on the decision in <u>Greene</u>, which in turn looked to <u>McCurdy</u> in determining the existence and scope of a "clearly established" constitutional prohibition against an arrest motivated in part by an "insult to the [arresting] officer's dignity."  <u>Greene</u>, 310 F.3d at 897.  As explained, however, the rulings in <u>Greene</u> and <u>McCurdy</u> addressed situations in which no grounds to arrest existed prior to the insult to the defendant officer's dignity.

Here, by contrast, Defendant already had probable cause to arrest when he initiated the encounter with Plaintiff.  Neither <u>Greene</u>, <u>McCurdy</u>, nor any other case identified by Plaintiff (or uncovered in the Court's own research) would have alerted Defendant that his otherwise lawful arrest of Plaintiff might violate the First Amendment in light of the complaints, criticisms, and challenges to authority voiced by Plaintiff in the course of this arrest.  To the contrary, <u>Greene</u> states, albeit only in dicta, that qualified immunity is ***not*** negated by "[t]he mere fact that [the plaintiff] may have been engaged in constitutionally

26

protected speech at the time of his arrest." <u>Greene</u>, 310 F.3d at 898 n.2.[16]  Consequently, the second prong of the qualified immunity inquiry, like the first, must be resolved in Defendant's favor.[17]

Before leaving this matter, the Court believes it appropriate to step back and view the facts of this case in their larger context.  This litigation, distilled to its essence, arises from a situation in which an individual used objectionable language and became somewhat belligerent during a public meeting, leading a nearby police officer to request that he calm down.  Most people in this situation, one hopes, would appreciate and promptly heed the officer's advice.  In this case, of course, Plaintiff instead challenged the officer's authority and continued to disrupt the public meeting, and he then was arrested and detained for an hour or so on charges that were dismissed about a month later, without any apparent effort at prosecution or need for Plaintiff to respond.

Here again, one would hope that most of us, under similar circumstances, would be relieved that our momentary loss of composure and disrespectful behavior toward a police

---

[16]Notably, <u>Greene</u> indicates in this same passage that qualified immunity would remain available even if the defendant officer mistakenly but reasonably believed that he had probable cause to arrest the plaintiff.  <u>See</u> <u>Greene</u>, 310 F.3d at 898 n.2 (noting that "*arguable* probable cause" is sufficient to trigger qualified immunity (internal quotation marks and citation omitted)).  Thus, even if the Court were incorrect its earlier conclusion that probable cause existed to arrest Plaintiff, Defendant still would be shielded by qualified immunity for his reasonable belief that this arrest was justified.

[17]Having resolved all of the federal claims asserted in this action, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state-law claims.  <u>See</u> 28 U.S.C. § 1367(c)(3).  The Court notes Plaintiff's concession, however, that his state-law claims of false arrest and false imprisonment cannot survive if, as this Court has now held, his arrest was supported by probable cause.  (<u>See</u> Plaintiff's Response at 19.)

officer had no lasting consequences.  Yet, Plaintiff sought to turn these events to his

advantage by commencing a federal civil rights suit and seeking an award of damages.

As set forth above, the law does not recognize a federal constitutional violation under

these facts — a result that strikes the Court as entirely just and appropriate.

### IV.  <u>CONCLUSION</u>

For the foregoing reasons,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's Motion for

Summary Judgment is GRANTED.


s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  May 4, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on May 4, 2005, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager